# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CORNELL HERBERT,

  *Plaintiff*,

  v.

THE ARCHITECT OF THE CAPITOL,

  *Defendant*.

Civil Action No. 07-01516 (CKK)

## MEMORANDUM OPINION
(February 23, 2011)

  Plaintiff Cornell Herbert ("Herbert"), an African American, commenced this action against his current employer, the Architect of the Capitol (the "AOC") on August 24, 2007, claiming that he was discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and the Congressional Accountability Act of 1995 (the "CAA"), 2 U.S.C. § 1301 *et seq.* Presently before the Court is the AOC's [25] Motion for Summary Judgment, wherein the AOC contends principally that a reasonable fact finder could not conclude either (a) that the specific employment actions challenged by Herbert in this action were sufficiently adverse to support Herbert's claims for discrimination or to support his claims for retaliation or (b) that its proffered explanations for taking the challenged employment actions were not the actual reasons and were instead undertaken with discriminatory or retaliatory intent. As set forth in greater detail below, the Court concludes that Herbert has failed to discharge his burden of identifying specific facts establishing that there is a genuine dispute requiring trial on essential elements of each of his causes of action. Therefore, based upon the parties' submissions, the attachments thereto, the

relevant authorities, and the record as a whole, the Court shall GRANT the AOC's [25] Motion

for Summary Judgment and DISMISS this action in its entirety.[1]

# I. PRELIMINARY MATTERS

Preliminarily, the Court pauses to make an overarching observation about the nature of

Herbert's opposition to the present motion. The United States District Court for the District of

Columbia has supplemented Rule 56 of the Federal Rules of Civil Procedure with Local Civil

Rule 7(h), which requires that each party submitting a motion for summary judgment attach a

statement of material facts for which that party contends there is no genuine dispute, with

specific citations to those portions of the record upon which the party relies in fashioning the

statement. The party opposing the motion must, in turn, submit a statement enumerating all

material facts which the party contends are genuinely disputed. *See* Local Rule LCvR 7(h)(1).

This well-reasoned rule "places the burden on the parties and their counsel, who are most

familiar with the litigation and the record, to crystallize for the district court the material facts

and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett &*

---

[1] The Court has considered the following documents in the course of rendering its decision, listed in chronological order of their filing: Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J., Docket No. [25]; Def.'s Stmt. of Material Facts as to Which There Is No Genuine Issue ("Def.'s Stmt."), Docket No. [25]; Decl. of Sterling Thomas ("Thomas Decl."), Docket No. [28]; Def.'s Notice of Recent Authority, Docket No. [29]; Pl.'s Opp'n to Summ. J. ("Pl.'s Opp'n"), Docket No. [31]; Pl.'s Resp. to Def.'s Stmt. of Material Facts as to Which There Is No Genuine Issue ("Pl.'s Stmt."), Docket No. [31-1]; Def.'s Suppl. Mem. in Supp. of its Mot. for Summ. J., Docket No. [39]; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply"), Docket No. [41]; Pl.'s Opp'n to Def.'s Suppl. Mot. for Summ. J. ("Pl.'s 2d Opp'n"), Docket No. [42]; Decl. of Cornell Herbert ("Herbert Decl."), Docket No. [42-1]; Def.'s Reply to Pl.'s Opp'n to Def.'s Suppl. Mem. in Supp. of its Mot. for Summ. J., Docket No. [44]; Pl.'s Notice of Suppl. Persuasive Authority, Docket No. [45]. The parties have also filed a variety of notices and supplemental papers relating to the pending motion. For purposes of economy, the Court shall not cite to those documents here, but notes that it renders its decision today upon the parties' submissions, the attachments thereto, and the record as a whole.

*Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996).

In this case, the parties were informed that the Court strictly adheres to the dictates of this rule. *See* Scheduling & Procedures Order, Docket No. [13], ¶ 6. Indeed, Herbert was expressly instructed as follows:

> A party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied. The responding party should include any information relevant to its response in that paragraph. If the responding party has additional facts that are not addressed in the corresponding paragraphs, the responding party should include these at the end of its responsive statement of facts. At all points, parties must furnish precise citations to the record on which they rely.

*Id.* While Herbert has provided the required response statements in opposition to the AOC's pending motion, he has nevertheless failed to fully discharge his burden. First, while Herbert precedes each paragraph in his statement with the term "agrees" or "disputes," it is often difficult to discern the extent of his agreement or disagreement. On the one hand, where Herbert "agrees," he repeatedly restates the facts identified by the AOC in such a way as to obfuscate the extent of his agreement. On the other hand, where Herbert "disputes" a paragraph, he frequently fails to clarify whether he disputes the paragraph in full or in part and, if only in part, specifically identify which portions are undisputed. Second, Herbert's denials consistently devolve into a lengthy narrative of purported facts—and, on occasion, legal argument—that simply are not directly relevant to opposing the discrete facts put forward by the AOC. To the extent Herbert considered additional facts to be relevant to the issues raised in the pending motion, he should have, as instructed, included those additional facts as separate paragraphs at the end of his statement in order to afford the AOC a meaningful opportunity to respond to those facts. Instead,

Herbert has impermissibly shifted his burden to locate and identify the relevant disputed facts to this Court. In an exercise of its discretion, the Court has considered Herbert's statement in its entirety and references it, where appropriate, in identifying those facts germane to the pending motion. Nevertheless, to the extent there has been any confusion as to the extent of Herbert's agreement or disagreement with the AOC's proffered facts, the Court underscores that the fault and accountability for any such confusion must rest with Herbert, and not the AOC or this Court.

## II. BACKGROUND

Herbert is an African American employed in the AOC's Paint Shop. Def.'s Stmt. ¶¶ 1, 4; Pl.'s Stmt. ¶¶ 1, 4. Herbert began his employment with the AOC as a W-4 Laborer and over the years has progressed through the ranks; most notably, in March 2006, Herbert was promoted to the position of W-7 Painter Worker, and, in February 2007, he became a W-9 Painter. Def.'s Stmt. ¶¶ 2-4; Pl.'s Stmt. ¶¶ 2-4. During the course of his employment with the AOC, Herbert has repeatedly complained of allegedly unfair, discriminatory, and retaliatory treatment suffered by him and his fellow employees. The precise contours of each of these complaints are not germane here. Some of the allegations have been resolved amicably by the parties; others are or have been the subject of separate actions brought by Herbert in this District. *See Herbert v. Architect of Capitol*, No. 07 Civ. 1605 (CKK) (D.D.C.); *Herbert v. Architect of Capitol*, 09 Civ. 1719 (CKK) (D.D.C.). In the instant action, after a fair amount of early uncertainty, it is now clear that Herbert challenges a total of three employment actions. *See generally* Second Am. Compl. ("2d Am. Compl."), Docket No. [47]. Those actions are as follows:

- **Letter of Reprimand.** Herbert first challenges the AOC's decision to issue a letter of reprimand—proposed in early January 2007 and formally issued in June 2007—admonishing him for failing to perform assigned duties and using inappropriate language in the workplace. *Id.* ¶¶ 15-17, 20, 21.

- **Delayed Promotion.** Herbert next challenges an alleged delay in his promotion to the position of W-9 Painter, which became effective in early February 2007 even though Herbert's supervisors had allegedly determined that he merited the promotion earlier. *Id.* ¶ 14.

- **Internal Investigation.** Finally, Herbert challenges the AOC's alleged decision to launch an investigation into his purportedly "disruptive" behavior at the tail-end of 2006. *Id.* ¶¶ 18-19.

In all three instances, Herbert alleges that the challenged employment action was both discriminatory and retaliatory, meaning that there are a total of six discrete claims in this action. *Id.* ¶¶ 22-27. With this landscape set out, the Court now turns to the task of identifying the facts pertaining to these claims as to which there is no genuine dispute.

### A.    *Herbert's Internal Complaints and the Parties' Settlement Agreement*

In the late summer and early fall of 2005, Herbert began making several internal complaints with respect to purportedly unfair, discriminatory, and retaliatory treatment allegedly suffered by him and other African Americans working at the AOC.[2] Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5. For purposes of the present motion, the AOC does not contest that Herbert engaged in "protected activities." Most notably, in a letter dated September 16, 2005, Herbert wrote to the AOC's internal Equal Employment Opportunity and Conciliation Program ("EEO-CP"), raising allegations as to the use of racial epithets in the Paint Shop. Pl.'s Stmt. Ex. 1 at 180. In addition, in a letter dated October 12, 2005, Herbert and three other individuals alleged that qualified

---

[2] Herbert's complaints in this time period were not his only ones during the course of his employment: Herbert complained about allegedly discriminatory or retaliatory acts again in early September 2006 and early December 2006. Pl.'s Stmt. ¶ 5 & Ex. 4 at 226. More broadly, the record is clear that Herbert participated in an array of equal employment opportunity-related activities throughout the time period relevant to this action, including his use of internal grievance procedures to challenge the employment actions at issue in this litigation. The precise details of these activities need not be discussed here.

African Americans working at the AOC had been "overlooked for promotions and awards" and subjected to other disparate treatment. Pl.'s Stmt. Ex. 2 at 187. Herbert and the AOC were able to amicably resolve some of the issues involved in these disputes informally. Def.'s Stmt. ¶ 5 & Ex. 3 at 55, 58; Pl.'s Stmt. ¶ 5. Others required a formal settlement agreement.

On July 6, 2006, Herbert and the AOC entered into a written settlement agreement, pursuant to which Herbert released any and all claims that, as of that point in time, had been or could have been asserted against the AOC through his internal complaints and the associated alternative dispute resolution procedures. Def.'s Stmt. Ex. 2 ¶ 5(A). That is, the settlement was expressly designed to "constitute full and complete satisfaction of all claims . . . against the AOC that [Herbert] brought or could have brought arising out of his employment." *Id.* ¶ 6(E). In exchange for this broad release, so long as Herbert received a performance rating for year-end 2006 of "fully successful" or above, the AOC would "submit the necessary request to promote" Herbert to the position of W-9 Painter no later than January 31, 2007, with the promotion becoming effective "as soon as possible thereafter" and under no circumstances "beyond . . . February 17, 2007." *Id.* ¶ 5(C). In other words, the settlement agreement required the AOC to set the process of promoting Herbert in motion by the end of January 2007 and to ensure that the promotion became effective by mid-February 2007.

In accordance with the contemplated time frame, the AOC commenced the process for formally approving Herbert's promotion on or about December 27, 2006 and completed the approval process by January 25, 2007. Def.'s Stmt. ¶ 29; Dep. of Frank John Tiscione ("Tiscione Dep."), Docket No. [32-10], at 103 & Ex. 13 at 1. Herbert's promotion to the position of W-9 Painter became effective on February 4, 2007. Def.'s Stmt. ¶ 29 & Ex. 1 at 4; Tiscione Dep. at

103 & Ex. 13 at 1.  Herbert remains in that position.

### B.    *The Events Occurring During the 2006 Congressional Move*

Every two years, in the month following the congressional elections, the AOC is tasked

with organizing what it refers to as the "congressional move."  Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.

In a three-week period, the AOC is charged with moving 180 to 200 members of Congress, a

project that includes painting, wiring, carpeting, and reorganizing congressional facilities.  Def.'s

Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.  The project is a major one for the AOC and the Paint Shop in which

Herbert is employed.  Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.  Indeed, it is generally considered to be the

"busiest time" for the Paint Shop.  Dep. of William Wood, Jr. ("Wood Dep."), Docket No. [32-

9], at 13.  In order to meet the tight time constraints imposed upon its work, the Paint Shop

engages 40 to 50 painters on a temporary basis and paints around the clock.  Def.'s Stmt. ¶ 7;

Pl.'s Stmt. ¶ 7.

On a single evening during the 2006 congressional move, Herbert was involved in a pair

of incidents, one concerning the responsibility of Paint Shop workers for moving furniture in the

course of discharging their painting responsibilities and a second involving a verbal altercation

between Herbert and a co-worker.  Def.'s Stmt. ¶ 8; Pl.'s Stmt. ¶ 8.  While Herbert and the AOC

sharply dispute the precise sequence of events pertaining to these two incidents, there is

surprisingly little disagreement over their general contours and the parties' respective

contemporaneous interpretations thereof; unless otherwise indicated, the narrative that follows

rests on undisputed facts or those facts as to which there can be no genuine dispute.

### 1.    Herbert's "Failure to Perform Assigned Duties"

On the evening of December 2, 2006, Herbert and others in his crew were assigned to

paint a suite in the Longworth House Office Building. Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9. Charlie

Brown ("Brown") was the crew leader, or "point man," for that evening and was working on

location with the crew. Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9. Herbert and Brown were the only

permanent painters on the crew that evening. Dep. of Cornell Herbert ("Herbert Dep."), Docket

No. [32-7], at 30-31. Meanwhile, David Dean ("Dean"), the Shift Supervisor, and Edward

Williams ("Williams"), the Supervisor of the Paint Shop, were both on duty and were on the

premises in administrative offices located a relatively short distance away from the crew. Def.'s

Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.

Upon arriving at the suite, the crew discovered that furniture in the room had not been

moved and would need to be before painting could begin. Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9. The

crew members, including Brown, were displeased with the prospect of having to move furniture

before beginning their work and proceeded to complain among themselves. Def.'s Stmt. ¶¶ 9,

21; Pl.'s Stmt. ¶¶ 9, 21. The crew's displeasure likely had its origins in a long-running tension

between the Paint Shop and the Chief Administrative Office of the House (the "CAO") over the

allocation of responsibility for moving furniture during the course of a congressional move. The

exact details of that tense relationship are immaterial here; suffice it to say that although efforts

had been made within the Paint Shop to shift more of the burden of moving furniture from the

Paint Shop to the CAO, workers in the Paint Shop had nevertheless historically been required,

albeit not without some resentment, to occasionally move furniture in order to complete their

assigned duties. Def.'s Stmt. ¶ 21 & Ex. 9 at 133; Pl.'s Stmt. ¶¶ 7, 21; Tiscione Dep. at 88-89;

Dep. of Edward Williams, Sr. ("Williams Dep."), Docket No. [32-15], at 81-82, 148-49.

Unfortunately, as was the case here, the CAO was not always sufficiently reliable to meet the

tight deadlines imposed during a congressional move.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.

Herbert, relying upon a written statement prepared by Brown[3] and his own deposition testimony, maintains that, upon discovering the state of the furniture in the suite, others within the crew began complaining about having to move the furniture and using inappropriate language.  Pl.'s Stmt. ¶ 9(b) (citing Def.'s Stmt. Ex. 8; Herbert Dep. at 38).  These allegations are, if not undisputed, sufficiently supported by the record such that, viewing the evidence in the light most favorable to Herbert, the Court shall assume them to be true for purposes of the present motion.  Brown's recollection of the events is that both he and his crew began complaining "a bit" amongst themselves when they discovered the suite was full of furniture, Def.'s Stmt. Ex. 6 at 224, and Herbert concedes that  he "got fussing" and "got cussing like the rest of the guys got cussing," Herbert Dep. at 38.  Brown then recalls that, when he informed the crew that it would have to start moving furniture, Herbert "[i]mmediately . . . started yelling [and] complaining," and using inappropriate language.  Def.'s Stmt. Ex. 6 at 224.  Consistent with this recollection, Herbert admits that he said to Brown, "I didn't come here tonight to F'ing move this furniture."  Herbert Dep. at 40.  Brown's recollection of Herbert's statement is essentially the same: he provides that Herbert said, "[I] didn't come down to this Mother-F--er today to move no mother f---ing furniture."  Def.'s Stmt. Ex. 6 at 224.  By his own admission, Herbert then "told [] Brown that [he] was not going to move furniture."[4]  Def.'s Stmt. Ex. 8 at

---

[3]  Brown, now deceased, is unavailable for testimony at trial.

[4]  Herbert concedes that he questioned a supervisor's order but maintains that it was acceptable for him to do so, relying exclusively on the deposition testimony provided by William Wood ("Wood"), the Assistant Superintendent.  Pl.'s Stmt. ¶ 11 (citing Wood Dep. at 23).  In the cited testimony, Wood stated merely that it is acceptable for an employee to question an instruction provided that he or she actually "follow[s]" and "complies with" the instruction.

173.

Brown immediately called Dean, who in turn informed Brown that the crew would have to move the furniture and that anyone who refused to do so would have to report to him and Williams. Def.'s Stmt. ¶¶ 9-11 & Ex. 6 at 224; Pl.'s Stmt. ¶¶ 9-11. Herbert left the suite to see Dean and Williams. Def.'s Stmt. ¶ 12 & Ex. 8 at 173; Pl.'s Stmt. ¶ 12. According to Brown,[5] who remained in the suite, the other members of the crew were "very upset" that Herbert had left while they began moving the furniture. Def.'s Stmt. Ex. 6 at 224. It is undisputed that Herbert was the only member of the crew who left the suite to complain, and there is no evidence in the record suggesting that anyone apart from Herbert told Brown that they would not move furniture.

Herbert then met with Williams. Def.'s Stmt. ¶ 14; Pl.'s Stmt. ¶ 14. Admittedly upset, Herbert continued his complaints about moving furniture and the allocation of responsibility between the Paint Shop and the CAO. Def.'s Stmt. ¶ 14 & Ex. 8 at 173; Pl.'s Stmt. ¶¶ 12, 14; Herbert Dep. at 40-41. After Herbert suggested that the CAO was responsible for moving the furniture in the suite, Williams informed Herbert that moving furniture was part of his job description in the event the CAO failed to do so and that he had to move furniture like anyone else.[6] Def.'s Stmt. ¶ 14 & Ex. 4 at 135; Pl.'s Stmt. ¶ 14; Williams Dep. at 54, 148-49. At his

---

Wood Dep. at 23.

[5] Herbert contends that, of the various individuals who made statements or were deposed in connection with this action, only he and Brown have personal knowledge of the events that transpired in the suite. Pl.'s Stmt. ¶ 9(b). Because Herbert had left the suite, we are left, between the two, only with Brown's characterization of the crew's reaction.

[6] The parties dedicate an inordinate amount of time debating whether moving furniture is within the express terms of Herbert's written job description. But the job description clearly lists among the various responsibilities attaching to Herbert's position "[m]ov[ing] furniture to the middle of the room" and "handl[ing] materials/equipment weighing 40 pounds and over." Pl.'s

deposition, Williams testified definitively that, at this point in the conversation, Herbert stated that he would not move any furniture in the suite. Williams Dep. at 49, 54. Herbert, for his part, denies that he "specifically" told Williams that he refused to move furniture. Pl.'s Stmt. ¶ 12. Regardless of whether Herbert did or did not "specifically" refuse to move furniture a second time, it is undisputed that Herbert initially resisted the instruction and strenuously voiced his objections. In the end, Williams directed Herbert to return to work and Herbert agreed. Herbert Dep. at 42; Williams Dep. at 56-67. Herbert suggested that he would raise the issue again later. Def.'s Stmt. Ex. 4 at 135.

Following his conversation with Williams, Herbert returned to the suite. Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15. The parties dispute whether Herbert actually moved any furniture upon his return. According to Herbert, there was still furniture to be moved in the suite and he "started moving furniture" upon his return. Herbert Dep. at 45. Brown, for his part, recalls that the furniture had already been moved and Williams recalls Brown informing him of this fact. Def.'s Stmt. Ex. 6 at 224; Williams Dep. at 59. The dispute is immaterial; whatever efforts Herbert did make to move furniture upon his return, they were short-lived. Shortly after Herbert's return, the CAO movers arrived and completed the move.[7] Pl.'s 2d Opp'n at 4; Herbert Dep. at 45.

_____

Stmt. Ex. 11 at 229. Even if this were not the case, the job description clearly contemplates that Herbert would "[p]erform[] other duties as assigned." *Id.*

[7] The parties also dispute whether Herbert tried to encourage others to refuse to move furniture and to collect the names of others who agreed with his position. Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15. According to one co-worker on the crew, Herbert directed them "not to lift a f---ing thing [as] he was going to file a grievance." Def.'s Stmt. Ex. 9 at 133. However, the Court finds there is a genuine dispute as to whether Herbert actively attempted to solicit others to his cause and therefore assumes that he did not for purposes of this motion.

## 2.     Herbert's "Verbal Altercation" with a Co-worker

Shortly after his return to the suite, Herbert was involved in a verbal altercation with a temporary painter on the crew, Wendell Cavin ("Cavin").[8]  Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16. During the course of this altercation, Cavin admittedly used a racially charged epithet—namely, the "n word."[9]  Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.  Immediately upon the heels of this altercation, Herbert left the suite and informed Williams of what had transpired.  Def.'s Stmt. ¶ 20 & Ex. 8 at 175; Pl.'s Stmt. ¶ 20.  Williams spoke with Cavin, who admitted that he made the comment attributed to him; Williams told Cavin that such language would not be tolerated, confiscated Cavin's badge, and sent him home.  Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20; Williams Dep. at 64-65, 72, 149.  It is undisputed that Cavin offered to apologize for his conduct, and that Herbert declined to accept the apology.[10]  Def.'s Stmt. ¶ 20 & Ex. 8 at 175; Pl.'s Stmt. ¶ 20.  At his deposition, Williams testified that he would have disciplined Cavin even if Herbert had accepted the apology.  Williams Dep. at 70

---

[8]  Herbert disputes that he was "engaged" in a verbal altercation, suggesting that Cavin was solely responsible.  Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.  Cavin, for his part, maintains that Herbert was "screaming [and] yelling and provoking [him]."  Def.'s Stmt. Ex. 9 at 134. Whatever the merits of Herbert's interpretation, the disagreement is immaterial; the AOC has never suggested in this litigation that Cavin's conduct was either justified or justifiable, or that Herbert was somehow to blame.

[9]  The record is unclear as to exactly how the word was used.  Herbert contends that Cavin launched into an extended tirade calling him, among other things, "a crybaby f---ing nigger" and told him to "shut the f--- up you f---ing nigger."  Herbert Dep. at 45.  Meanwhile, Cavin maintains that he used the phrase, "nigger please," and that he "did not mean anything racial by it."  Def.'s Stmt. Ex. 9 at 133.  The Court need not resolve the dispute.

[10]  Herbert "disputes the notion that [] Cavin wanted to apologize."  Pl.'s Stmt. ¶ 20. What Herbert appears to mean is that he disputes the genuineness of the apology, as it is undisputed that Cavin offered to apologize.  *Id.*

### C.    Herbert's Letter of Reprimand

The AOC began its factual investigation into the above-described events the very same evening.  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Williams Dep. at 75-78.  In the course of the investigation, various witness statements were prepared and subsequently forwarded to Wood, the Assistant Superintendent, and Human Resources.[11]  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24.  Ultimately, Williams, in consultation with his superiors, recommended that Herbert be disciplined.  Def.'s Stmt. ¶ 23; Pl.'s Stmt. ¶ 23; Williams Dep. at 79-80.

On December 14, 2006, Wood, the Assistant Superintendent, and Frank Tiscione ("Tiscione"), the Superintendent, wrote to the Employee Relations Branch ("Employee Relations") requesting an official reprimand for Herbert "for his refusal to obey a direct order."[12]  Def.'s Stmt. Ex. 11.  Employee Relations proceeded to process the request and prepared a letter of proposed reprimand for Williams' signature.  Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25.

On January 9, 2007, Williams sent Herbert a letter, wherein Williams proposed that Herbert be disciplined "for failure to perform assigned duties, and inappropriate language in the

---

[11]  Herbert contends that something less than the full universe of witness statements was forwarded to Human Resources, Pl.'s Stmt. ¶ 24(f), but the record simply does not indicate one way or the other.  Even assuming Herbert is correct, there is no support for his contention that any omission was "intentional so as to avoid . . . [the] consideration of exculpatory information when [Human Resources] processed the discipline request."  *Id.*  In other words, the inference is not justifiable based upon the record created by the parties, especially since the specific witness statements that Herbert contends were omitted are, if anything, "inculpatory" in the sense that they are consistent with the AOC's interpretation of the events in question.  *See* Def.'s Stmt. Exs. 4, 7, 9.

[12]  The initial request did not cite Herbert's "inappropriate language," though it was subsequently incorporated into the final letter of reprimand.  While the parties disagree as to how this came about, it is undisputed that Williams at some point in the process preferred to limit the reprimand to Herbert's refusal to move furniture.  Def.'s Stmt. ¶ 27; Pl.'s Stmt. ¶ 27.

workplace." Def.'s Stmt. ¶ 26 & Ex. 12 at 146; Pl.'s Stmt. ¶ 26. The letter stated that Herbert

had "refused to move the furniture" in the Longworth House Office Building and that, in the

course of expressing his disagreement, stated, "I didn't come down this mother-f--ker today to

move no mother f--ing furniture." Def.'s Stmt. Ex. 12 at 146. The only discipline proposed was

a future letter of reprimand. *Id.* at 147. Williams' proposal clearly stated that it was non-final

and that Tiscione had the authority to modify the decision. *Id.* Herbert was informed that he had

a right to review the material supporting the proposed reprimand and to reply in writing. *Id.* at

146.

Two days later, on January 11, 2007, Herbert, through counsel, requested an extension of

time to respond to the proposal, the materials supporting the allegations therein, and an

opportunity to interview various individuals. Pl.'s Stmt. ¶ 28 & Ex. 20. On January 23, 2007,

Herbert filed an internal complaint of discrimination and retaliation in connection with the

proposed reprimand. Pl.'s Stmt. ¶ 28 & Ex. 21. The next day, on January 24, 2007, Herbert's

counsel responded to the proposed reprimand in writing. Def.'s Stmt. ¶ 28 & Ex. 13. Herbert

asserted, *inter alia*, that he did not "refuse" to move furniture, but rather "initially disagreed."

Def.'s Stmt. Ex. 13 at 145.

By letter dated May 4, 2007—approximately four months after Williams first proposed

reprimanding Herbert—Tiscione sent Herbert a letter in which he concurred that Herbert should

be reprimanded. Def.'s Stmt. ¶ 30 & Ex. 14; Pl.'s Stmt. ¶ 30. In the letter, Tiscione incorporated

the reasons stated in Williams' prior correspondence and underscored that the proposed

reprimand was "not based on complaints, but inappropriate language and failure to perform

assigned duties." Def.'s Stmt. Ex. 14 at 194. The letter stated that the proposed reprimand was

non-final, and that Herbert had a right to request that a Hearing Officer review the matter. *Id.*

Herbert subsequently requested a review of the proposed reprimand by a Hearing Officer, who found in a memorandum dated May 22, 2007 that the basis for the reprimand "was amply supported by the evidence." Def.'s Stmt. ¶¶ 31-32 & Exs. 15, 17; Pl.'s Stmt. ¶¶ 31-32. The matter was also separately reviewed by the EEO-CP, which found that "there [was] insufficient evidence" to establish that a nexus existed between the proposed reprimand and Herbert's prior complaints, and recommended that the AOC "move forward to process the proposed discipline." Def.'s Stmt. ¶ 33 & Ex. 16 at 219; Pl.'s Stmt. ¶ 33 & Ex. 3 at 219.

The reprimand became final on June 15, 2007. In a letter from Stephen T. Ayers ("Ayers"), then-Acting Architect of the Capitol, Herbert was notified of the AOC's "final decision . . . to officially reprimand [him] for failure to perform assigned duties, and inappropriate language in the workplace." Def.'s Stmt. Ex. 18 at 193. The letter concluded:

> Copies of this official reprimand, proposal, and concurrence letters will be placed in your official personnel folder (OPF) and may form the basis for more severe disciplinary action in the event of future instances of misconduct. If there are no further disciplinary problems, these documents may be removed from your OPF, at your written request, after one year from the date of the official reprimand.

*Id.* Herbert's letter of reprimand was, in fact, subsequently removed from his personnel file. Def.'s Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.

### D. The AOC's Response to Cavin's Conduct

As previously indicated, after Cavin admitted that he made the comment attributed to him, Williams confiscated Cavin's badge and sent him home. Less than two weeks later, on December 14, 2006, Tiscione wrote Tonda Cave, an Employee Relations Specialist, requesting an update "on where we are on the termination action for the Temp Painter who used the 'n-

word.'" Def.'s Stmt. Ex. 19 at 1. Cave responded that same day, indicating that she had started drafting the required paperwork, but could not "move forward until [she] received the 'official' request for reprimand." *Id.* What transpired next is not clear from the record; however, by letter dated December 26, 2006, Ayers notified Cavin in writing that his employment would be terminated effective December 29, 2006 due to his admitted use of a racial slur in the course of his verbal altercation with Herbert. Def.'s Stmt. Ex. 20 at 221. Ayers stated that "the use of racial slurs is unacceptable and can not be tolerated." *Id.* Cavin was advised that he could seek reconsideration of the decision. *Id.* However, Cavin, whose temporary employment was likely to conclude shortly thereafter in any event, resigned before the termination process was completed. Def.'s Stmt. ¶ 35 & Ex. 21; Dep. of Charles David Bryan ("Bryan Dep."), Docket No. [32-1], at 24-25; Williams Dep. at 46.

### E.      *The Internal Investigation Concerning the Paint Shop*

At the end of 2006, around the time that the events described above were unfolding, Cave was tasked with conducting an investigation concerning the Paint Shop. Def.'s Stmt. ¶ 43; Pl.'s Stmt. ¶ 43; Dep. of Tonda Cave ("Cave Dep."), Docket No. [32-2], at 49. The parties dispute the focus of the investigation: Herbert asserts that he was the "target," while the AOC maintains that the focus was disruptive behavior in the Paint Shop more broadly.

Notes prepared by Cave early in the course of the investigation refer to an unidentified "troublemaker" in the Paint Shop and characterize that individual as "so disruptive that the work is not getting done," which was of heightened concern in light of the "critical deadlines with the [congressional] move[]." Def.'s Stmt. Ex. 25 at 3. During the course of her deposition, Cave consistently denied that the investigation was targeted at anyone in particular, and specifically

denied that Herbert was the "troublemaker" referred to in the notes. Cave Dep. at 61-71. She

testified that the impetus for her investigation was a more "general attitude of . . . discontent and

disruption" within the Paint Shop. *Id.* at 57. Consistent with this testimony, the notes identify an

assortment of broad issues affecting the Paint Shop—including, "disrespectful behavior, name

calling, berating, swearing/foul language, intimidation of coworkers, alienating others"—and go

on to provide that the investigation was directed towards "find[ing] out what is going on in the

Paint Shop." Def.'s Stmt. Ex. 25 at 3. While the documentary evidence suggests that broader

issues affecting the Paint Shop were investigated, Herbert's name arose with some frequency

during the course of the investigation. Def.'s Stmt. Ex. 25. Viewing the evidence in the light

most favorable to Herbert, the Court concludes that there is a genuine dispute as to whether

Herbert was the referenced "troublemaker" and the impetus for the AOC's investigation.

The investigation began in earnest on or about December 8, 2006, when interviewees

were provided a memorandum stating that Cave was authorized to investigate "allegations of

misconduct" without further elaboration. Pl.'s Stmt. Ex. 19. Cave kept Bob Gleich, the Deputy

Superintendent, apprised of the progress of her investigation, informing him that "interviews

showed that [Herbert] seem[ed] to stir the pot, create dissension amongst the employees." Cave

Dep. at 152. The investigation, however, never formally concluded, and Cave's written report

never proceeded beyond a draft form. Def.'s Stmt. ¶ 43 & Ex. 26; Pl.'s Stmt. ¶ 43(e). Herbert

contends that "[i]t is reasonable to conclude that the reason [the] report was never finalized" is

that the AOC wanted to "conceal" evidence of discrimination or retaliation. Pl.'s Stmt. ¶ 43(h).

Simply put, Herbert falls far short of his burden of adducing sufficient evidence to justify such an

inference. The uncontradicted evidence in the record suggests, if anything, that the report was

never finished because Cave simply "dropped the ball" and her supervisors never followed up on the matter or requested a final report. Cave Dep. at 108.

In any event, the draft of Cave's report provides, under the heading "investigatory conclusions," that "[t]here [was] credible information to support the original complaint that there [was] a specific person(s) so disruptive that the work and morale of the Paint Shop [was] adversely impacted." Def.'s Stmt. Ex. 26 at 4. In response, Cave recommended diversity and equal employment opportunity training and meetings concerning day-to-day expectations and interactions with co-workers. *Id.*; Cave Dep. at 152.

### III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact, and therefore "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a

genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual

basis in the record cannot create a genuine dispute sufficient to survive summary judgment.

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

Moreover, where "a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact," the district court may "consider the fact undisputed for

purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make

credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the

light most favorable to the non-movant, with all justifiable inferences drawn in his favor.  *Liberty*

*Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are

susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v.*

*Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477

U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted," *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).

In recognition that it may be difficult for the plaintiff in an employment discrimination or

retaliation action to uncover clear proof of discriminatory or retaliatory intent, the district court

should approach summary judgment in such actions with "special caution."  *Aka v. Washington*

*Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nevertheless, the plaintiff is not relieved of his obligation to support his allegations with competent evidence establishing that there is a genuine dispute of material fact. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As is always the case, where the plaintiff will bear the burden of proof at trial on a dispositive issue, he bears the burden of production to designate specific facts showing that there is a genuine dispute for trial. *Ricci v. DeStefano*, __ U.S. __, 129 S. Ct. 2658, 2677 (2009). Absent this burden, a party could effectively defeat the "central purpose" of the summary judgment device—"to weed out those cases insufficiently meritorious to warrant . . . a jury trial"—simply by way of offering conclusory allegations, speculation, and argument. *Green v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). With these principles in mind, the Court turns to the merits of the AOC's Motion for Summary Judgment.

## IV. DISCUSSION

Herbert challenges three separate employment actions in this action as discriminatory and retaliatory: the letter of reprimand; the alleged delay in his promotion; and the internal investigation. The Court's discussion herein proceeds in three parts: (a) the Court shall first explain why no reasonable fact finder could conclude that these three employment actions were sufficiently adverse to support Herbert's claims for retaliation; (b) the Court shall then turn to explaining why the same holds true for Herbert's claims for discrimination; (c) finally, even assuming, *arguendo*, that the three employment actions were sufficiently adverse, the Court shall explain why no reasonable fact finder could conclude that the AOC's proffered explanations for two of the three actions at issue were not the actual reasons and were instead pretextual.

**A.** **No Reasonable Fact Finder Could Conclude that the Challenged Employment Actions Were Sufficiently Adverse to Support Herbert's Retaliation Claims**

Under Title VII, it is unlawful for an employer "to discriminate against any of [its] employees . . . because [an employee] has made a charge . . . or participated in any manner in an investigation of discrimination." 42 U.S.C. § 2000e-3(a).[13] While this provision has been "construed to cover a broad range of employer conduct," *Thompson v. N. Am. Stainless, LP*, __ U.S. __, 2011 WL 197638, at *3 (Jan. 24, 2011), it is well-established that Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 615 (D.C. Cir. 2010) ("The question of the 'adversity' required for an 'action' to be retaliatory naturally depends on objective differences between the conditions before and after the [challenged action]."). Therefore, to prevail on a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action "*materially adverse.*" *Id.* at 68 (emphasis added). Under the standard articulated by the Supreme Court, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or

---

[13] In enacting the CAA, Congress extended the protections of Title VII to employees of the legislative branch. 2 U.S.C. § 1311(a)(1). It also includes its own anti-retaliation provision. 2 U.S.C. § 1317(a). Claims arising under that provision are analyzed under the familiar framework and standards governing Title VII's anti-retaliation provision. *See, e.g.*, *Timmons v. U.S. Capitol Police Bd.*, 407 F. Supp. 2d 8, 11 (D.D.C. 2005); *Bolden v. Office of Architect of Capitol*, No. 01 Civ. 251 (CKK), 2005 WL 607875, at *4-5 (D.D.C. Mar. 15, 2005); *Trawick v. Hantman* 151 F. Supp. 2d 54, 62-63 (D.D.C. 2001), *aff'd*, No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002). Indeed, courts routinely rely upon Title VII case law when evaluating whether a challenged employment action is sufficiently adverse under the CAA's anti-retaliation provision. *See, e.g.*, *Clark v. Hantman*, No. 02-5313, 2003 21018860, at *1 (D.C. Cir. Apr. 29, 2003) (per curiam); *Vanover v. Architect of Capitol*, No. 01-5352, 2002 WL 31027573, at *1 (D.C. Cir. Sept. 11, 2002) (per curiam).

supporting a charge of discrimination." *Id.* (internal quotation marks omitted).[14] The district

court must take care to "separate significant from trivial harms," *Burlington*, 548 U.S. at 68,

keeping in mind that Title VII does not set forth "a general civility code for the American

workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and that courts

should refrain from "engag[ing] in judicial micromanagement of business practices by second-

guessing employers' decisions," *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008)

(internal quotation marks omitted).

> **1.     No Reasonable Fact Finder Could Conclude that the Letter of Reprimand Was "Materially Adverse"**

The United States Court of Appeals for the District of Columbia recently addressed the

question of when a letter of reprimand may rise to the level of an actionable adverse action under

Title VII's anti-retaliation provision.  In *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008),

the employee received, in addition to two letters of counseling, an official letter of reprimand.

The essential thrust of the letter of reprimand at issue in *Baloch* is virtually identical to the one at

issue in the instant action; the letter begins by faulting the employee for his "failure to perform

duties as directed, failure to follow a supervisor's directive[,] and unprofessional and

discourteous conduct."  Def.'s Reply Ex. 1, Docket No. [41-1], at 1.  However, the letter does not

end there, but proceeds, over the course of five single-spaced pages, to castigate the employee in

exhaustive detail for what were characterized as "very serious matters of misconduct."  *Id.* at 4.

---

[14] Highlighting that Herbert engaged in arguably protected activity subsequent to the issuance of the letter of reprimand, the AOC argues that Herbert was not, in fact, dissuaded from making or supporting a charge of discrimination.  However, the standard of "material adversity" is an objective one, an eminently sensible rule designed to "avoid[] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  *Burlington*, 548 U.S. at 68-69.

The employee was told that the letter would be placed in his official personnel file for one year and "warned that future repetitions of [such] conduct or other misconduct could lead to a proposal of more severe disciplinary action . . . up to and including removal from [] employment." *Id.* at 4-5. Noting that the letter "contained no abusive language, but rather job-related criticism," the Court held that the employee could not show that the letter was materially adverse. *Baloch*, 550 F.3d at 1199. Herbert's letter of reprimand, which faults Herbert for his "failure to perform assigned duties, and [his use of] inappropriate language in the workplace" with minimal explication and which lacks any abusive language,[15] Def.'s Stmt. Ex. 18 at 193, is even less "adverse," to the extent it may even be characterized as such, than the letter in *Baloch*. Indeed, the contents of the letter are relatively bland and innocuous, and fall considerably short of the "excoriation" claimed by Herbert. Further, Herbert has presented no evidence suggesting that his pay, grade, or working conditions were in any affected by the letter, or that it has served as the basis for more severe disciplinary action. Finally, like the letter at issue in *Baloch*, Herbert's letter of reprimand was to remain in his personnel file for no more than a year, and it is undisputed that it has in fact been expunged from the AOC's records. Under these circumstances, no reasonable fact finder could conclude that the issuance of the letter of reprimand was "materially adverse."[16]

---

[15] The letter of reprimand incorporates the facts set forth in prior correspondence between the AOC and Herbert concerning the proposed reprimand, which included descriptions of the basic contours of the events that transpired and a quotation of a single statement attributed to Herbert. Def.'s Stmt. Exs. 12, 14.

[16] The parties dedicate an extraordinary amount of attention to the question of whether letters of reprimand are *per se* actionable or non-actionable. Their attention is misplaced; the case law is clear that the "material adversity" inquiry is necessarily context-specific and "is simply not reducible to a comprehensive set of clear rules." *Thompson*, 2011 WL 197638, at *4.

Herbert rejoins that the letter of reprimand carried with it the possibility that he would be subject to more severe disciplinary action. However, "mere speculation that a letter of reprimand *may* lead to future punishment is insufficient to establish an adverse employment action," *Coleman v. District of Columbia*, No. 04 Civ. 1325 (GK), 2006 WL 2434926, at \*4 (D.D.C. Aug. 22, 2006) (emphasis in original). Here, Herbert's argument is unsupported in the record and his "suggestion that the letter [of reprimand] may serve as the basis for some future discipline to be imposed against [him] is entirely speculative and cannot transform [it] . . . into an actionable adverse action." *Williams v. Dodaro*, 576 F. Supp. 2d 72, 89 n.14 (D.D.C. 2008).

Herbert first suggests that the issuance of the proposed reprimand "put [him] in fear" that it would "jeopardize his promotion" to W-9 Painter "because it would affect his performance rating." Pl.'s Stmt. ¶ 6. In this regard, Herbert relies upon a provision in the parties' prior settlement agreement providing that the AOC would promote Herbert provided he received a

_____

That said, the Court observes that a number of courts in this district have found an employer's action to be insufficiently adverse when presented with similar facts. *See Reshard v. LaHood*, No. 97 Civ. 2794 (RBW), 2010 WL 1379806, at \*17 (D.D.C. Apr. 7, 2010) (letter of reprimand for employee's failure to perform assigned duties not materially adverse, even though it would be placed in employee's personnel file for up to three years); *Harper v. Potter*, 456 F. Supp. 2d 25, 29 (D.D.C. 2006) (letter of "suspension" for failure to perform assigned duties that could remain in employee's personnel file for two years and serve as the basis for future discipline was not materially adverse, where suspension was hypothetical and the letter was expunged and "bore no consequences"); *Cochise v. Salazar*, 601 F. Supp. 2d 196, 198-99 & 201 (D.D.C. 2009) (letter of counseling "highlight[ing] plaintiff's 'rude and discourteous behavior'" and asking plaintiff to respect other employees would not have dissuaded a reasonable worker from making a charge of discrimination), *aff'd*, 377 Fed. Appx. 29 (D.C. Cir. 2010); *Halcomb v. Office of Senate Sergeant-at-Arms of U.S. Senate*, 563 F. Supp. 2d 228, 246-47 (D.D.C. 2008) (counseling memorandum and written warning for plaintiff's "refusal to perform certain assigned tasks" did not "constitute[] an adverse employment action because they did not effect [sic] the plaintiff's employment."), *aff'd*, 368 Fed. Appx. 150 (D.C. Cir. 2010); *but see Powell v. Lockhart*, 629 F. Supp. 2d 23, 40 (D.D.C. 2009) (letters of reprimand containing "questionable allegations of hostile and erratic workplace behavior" could dissuade a reasonable employee from engaging in protected activity).

performance rating for year-end 2006 of "fully successful" or above. Def.'s Stmt. Ex. 2 ¶ 5(C).

There are at least two problems with this contention. First, there is no support in the record for

Herbert's conjecture that the letter of proposed reprimand would have any bearing upon his

performance rating, especially where the proposal was made in early 2007, was clearly non-final,

and the relevant performance rating pertained to the prior year. Herbert simply fails to articulate

how a reasonable employee would be dissuaded from engaging in protected activity under these

circumstances. Second, although Herbert was required to include specific "references to the

parts of the record relied on to support" his contention, Local Rule LCvR 7(h)(1), he cites only to

allegations made in two iterations of his Complaint in this action, neither of which is verified.

Pl.'s Stmt. ¶ 6 (citing Compl., Docket No. [1], ¶ 22; First Am. Compl., Docket No. [14], ¶¶ 21,

23); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials.").

However, it is axiomatic that a party opposing summary judgment cannot rely on the unsupported

allegations set forth in the complaint but rather must come forward with competent evidence in

support of its claims, *Voinche v. Obama*, __ F. Supp. 2d __, 2010 WL 3833736, at *3 (D.D.C.

Sept. 29, 2010), and Herbert has failed to do so here.

Herbert next suggests that a handwritten note prepared by someone in Employee

Relations concerning the Hearing Officer's determination with respect to Herbert's internal

administrative appeal somehow evidences that, even though the letter of reprimand has

indisputably been removed from Herbert's personnel file, it may nevertheless serve as the basis

for more severe discipline in the future. Pl.'s Stmt. ¶ 36. Here too, there are at least two

problems with Herbert's contention. First, it is entirely speculative and therefore insufficient to

transform the letter of reprimand into an actionable adverse employment action. *Williams*, 576 F.

Supp. 2d at 89 n.14. Second even viewing the note in the light most favorable to Herbert, it is not reasonably susceptible to Herbert's proffered interpretation. The note merely provides that Employee Relations "acknowledge[d] the hearing officer's recommendation, and [would] review this form of progressive discipline should such an occasion arise in the future." Def.'s Stmt. Ex. 17 at 271; Pl.'s Stmt. Ex. 25 at 207. The phrase "this form of progressive discipline" is plainly a reference to the Hearing Officer's finding that, if Herbert's multiple refusals to move furniture were each counted as separate events, he would have been eligible for more severe discipline than the letter of reprimand he actually received. Def.'s Stmt. Ex. 17 at 271, 279; Pl.'s Stmt. Ex. 25 at 207. No reasonable fact finder could infer from the note that any actual effects followed, or could be reasonably anticipated, from Herbert's letter of reprimand.

Finally, Herbert avers, without any competent support in the record, that letters of reprimand "limit the employee's promotion and advancement opportunities and potential." Pl.'s 2d Opp'n at 16. Here, Herbert relies upon his cursory, eight-paragraph declaration in which he states that he was not appointed as a "point man" during the 2008 congressional move, approximately one year and nine months after the AOC first proposed to reprimand him. Herbert Decl. ¶ 5. In a wholly conclusory fashion, Herbert declares his "belie[f] that one of the reasons that [he] was not made a point man was because of the reprimand that [he] received in 2007." *Id.* ¶ 7. Simply put, Herbert's unsubstantiated personal belief is insufficient to create a genuine dispute. *See Sykes v. Napolitano*, 710 F. Supp. 2d 133, 144 (D.D.C. 2010) (an employee's "subjective belief . . . is insufficient to demonstrate that the [challenged employment action] was an adverse action"). To resist summary judgment, a plaintiff must put forward competent evidence in support of his claims and, by relying on "information and belief," Pl.'s 2d Opp'n at

16, Herbert has failed to discharge his burden of production. *See Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007) ("[A]ffidavits based upon belief are inadequate to support a motion for summary judgment."). Moreover, Herbert does not even appear to contend that the alleged denial of the "point man" role itself was a materially adverse action, but instead states his personal belief that "acting as a point man . . . entitles employees to better performance appraisals and performance awards" and "is an important factor in subsequent promotions." Herbert Decl. ¶ 8. This is insufficient to establish that Herbert was "denied a tangible opportunity to compete for a promotion." *Youssef v. Fed. Bureau of Investigation*, __ F. Supp. 2d __, 2011 WL 313289, at *3 (D.D.C. Feb. 2, 2011); *see also Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (requiring plaintiff to establish that she was denied "a tangible opportunity to advance her career").

In fact, Herbert concedes that he cannot "substatiat[e] the link between the disciplinary action at issue here and [] Herbert's promotion and advancement opportunities." Pl.'s 2d Opp'n at 16 n.4. Without ever specifically citing to the governing rule, Herbert appears to suggest that the present motion should be denied because discovery in this action closed before the "point man" selection process was completed and therefore he "cannot present facts essential to justify [his] opposition." Fed. R. Civ. P. 56(d). For at least four reasons, the assertion is without merit. First, the rule plainly requires the party opposing summary judgment on this basis to identify the reasons why it is unable to present evidence by affidavit or declaration, *Townsend v. Mabus*, __ F. Supp. 2d __, 2010 WL 3563089, at *2 n.4 (D.D.C. Sept. 13, 2010), and Herbert impermissibly relies exclusively on the unsworn averments of his counsel. Pl.'s 2d Opp'n at 16 n.4. Second, the party must make its showing with sufficient particularity, *Shelvy Cnty., Ala. v. Holder*, 270

F.R.D. 16, 18 (D.D.C. 2010), and Herbert never identifies precisely what evidence he hopes to

discover. Herbert's generalized, speculative request "falls short of what the rule requires."

*Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010). Third, the rule

requires the party to establish that the evidence sought is "essential" to his opposition, and

Herbert fails to articulate how his speculation that nearly two years after the reprimand was

proposed he was denied an unofficial position that could hypothetically have led to further

employment opportunities "would alter the [C]ourt's determination."[17] *Cheyenne Arapaho*

*Tribes of Oklahoma v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009). Fourth, and finally, it

is not clear, as a purely factual matter, whether discovery actually did close prior to the so-called

"point man" selection process. Herbert declares that appointments were made "toward the end of

October 2008," and discovery in this action did not close until the following month. Min. Order

(Oct. 9, 2008).

In the end, despite Herbert's numerous arguments to the contrary, no reasonable fact

finder could conclude that the issuance of the letter of reprimand was "materially adverse."

*Burlington*, 548 U.S. at 67. Accordingly, summary judgment is warranted in the AOC's favor.

### 2. No Reasonable Fact Finder Could Conclude that the Alleged Delay in Herbert's Promotion Was "Materially Adverse"

Herbert contends that the AOC unlawfully delayed his promotion to W-9 Painter until

early February 2007, when his supervisors had allegedly determined that he merited the

---

[17] While by no means dispositive, the fact that Herbert consistently received individual cash awards throughout this two-year period—specifically, on March 4, 2007, May 13, 2007, November 26, 2008, and April 1, 2008—is some evidence that there was no causal connection between the reprimand and Herbert's alleged non-selection for the "point man" role. Def.'s Stmt. ¶ 34 & Ex. 1; Pl.'s Stmt. ¶ 34.

promotion earlier—specifically, before the 2006 congressional move. 2d Am. Compl. ¶ 14. Regardless of whether Herbert is correct that a relatively brief delay in promoting an employee may constitute a sufficiently adverse employment action, Herbert has failed to adduce evidence that would permit a reasonable fact finder to conclude that any such delay occurred. In other words, Herbert cannot show that he was subject to any employment action at all, let alone one that was materially adverse.

Herbert was promoted from the position of W-7 Painter Worker to the position of W-9 Painter in February 2007. Def.'s Stmt. ¶¶ 2-4; Pl.'s Stmt. ¶¶ 2-4. Herbert does not dispute that this promotion, including its timing, was mandated by the terms of the parties' settlement agreement. Pl.'s Stmt. ¶ 4. He contends, however, that Williams had decided to promote Herbert to this position independently of the settlement agreement and suggests that Williams deliberately (and unlawfully) delayed the promotion until after the congressional move was completed. His argument rests exclusively on a disingenuous interpretation of eight lines of testimony from Williams' deposition in this action. Pl.'s Stmt. ¶ 4. In that testimony, Williams stated that, at some unspecified point prior to the settlement agreement, Bryan approached him and indicated "that he thought that [Herbert was] doing very well and [that they] should promote him." Williams Dep. at 18. That is, before the settlement agreement came about, Williams and Bryan "had already talked about promoting [Herbert]." *Id.* Even viewing this testimony in the light most favorable to Herbert, it evidences at most there were preliminary discussions about and some intention to promote Herbert; it does not suggest that Williams or anyone else at the AOC had definitely decided to promote Herbert to W-9 Painter. Even if this were not the case, Williams' testimony does not evidence that there was any specific timetable for promotion—let

alone an intention to promote Herbert before the congressional move. Indeed, Williams unequivocally stated that the AOC "wanted to see how [Herbert] actually did with the [then] upcoming [congressional] move[]," and expressly indicated that he would not have taken any steps to initiate the promotion until after the congressional move had been completed. *Id.* at 18-19. In short, Herbert has presented no evidence that would allow a reasonable fact finder to conclude that anyone actually intended to promote Herbert prior to the time of his actual promotion, which complied with the date set out in the parties' settlement agreement. Having failed to establish that there is a genuine dispute as to whether he was subject to an adverse employment action, Herbert's claim must fail.[18]

### 3. No Reasonable Fact Finder Could Conclude that the Internal Investigation Was "Materially Adverse"

Herbert claims that the investigation conducted by Cave at the tail-end of 2006 was a materially adverse employment action. For various reasons, whether considered together or independently, no reasonable fact finder could find that the investigation would dissuade a reasonable employee from making or supporting a charge of discrimination: the investigation involved little more than interviews with various Paint Shop employees; it is undisputed that Cave's report never proceeded beyond draft form; even assuming that Herbert was the "target," there is little, if any, evidence that anyone apart from Cave and Gleich knew that; and the preliminary recommendations were limited to things like group-based diversity training with no recommendations specifically directed towards Herbert. *See supra* Part II.E. Herbert simply "offer[s] no evidence showing that the [] investigation . . . affected [his] employment in any

---

[18] In light of this conclusion, the Court need not reach the AOC's alternative argument that Herbert's claim is barred by the terms of the parties' settlement agreement.

meaningful way." *Halcomb*, 563 F. Supp. 2d at 246; *see also Brown*, 674 F. Supp. 2d at 191-92

(despite plaintiff's allegations that an investigation "cast . . . a shadow" on her employment,

caused her emotional distress, and made co-workers reluctant to work with her, she failed to

establish that it had any objective impact on her employment). Accordingly, the AOC is entitled

to summary judgment on this claim as well.

> **B.      No Reasonable Fact Finder Could Conclude that the Challenged Employment
> Actions Were Sufficiently Adverse to Support Herbert's Discrimination Claims**

As in the retaliation context, in order to present a viable claim for employment

discrimination under Title VII, a plaintiff must show that he or she suffered an "adverse

employment action." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008),

*cert. denied*, __ U.S. __, 129 S. Ct. 930 (2009). However, the standard is not identical. In this

context, "[a]n employee must experience materially adverse consequences affecting the terms,

conditions, or privileges of employment or future employment opportunities such that a

reasonable trier of fact could find *objectively tangible* harm." *Douglas v. Donovan*, 559 F.3d

549, 552 (D.C. Cir. 2009) (internal quotation marks and notations omitted) (emphasis added).

Ordinarily, "[a] tangible employment action . . . inflicts direct economic harm." *Burlington

Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis omitted). As attested by the

foregoing, the standard in the discrimination context is more stringent than in the retaliation

context. *See Baloch*, 550 F.3d at 1198 n.4 ("'Adverse actions' in the retaliation context

encompass a broader sweep of actions than those in a pure discrimination claim."). Because

Herbert has failed to establish that the employment actions he challenges are sufficiently adverse

under the more liberal retaliation rubric, his discrimination claims fail *ipso facto*.

**C.    No Reasonable Fact Finder Could Conclude that the AOC's Proffered Reasons
for Two of the Three Challenged Employment Actions Were Pretextual**

In this Circuit, once the employer has proffered a legitimate, non-discriminatory reason

for a challenged employment action, the "central question" becomes whether "the employee [has]

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee on the basis of race." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490,

494 (D.C. Cir. 2008); *accord Calhoun v. Johnson*, __ F.3d __, 2011 WL 192497, at *2 (D.C. Cir.

Jan. 21, 2011).  "[T]hese principles apply equally to retaliation claims."  *Jones v. Bernanke*, 557

F.3d 670, 678 (D.C. Cir. 2009).  Generally speaking, a claim should proceed to the jury if the

plaintiff is able to point to evidence from which a jury could find that the employer's stated

reasons for the challenged employment action were pretextual.  *Calhoun*, 2011 WL 192497, at

*2; *see also Pardo-Kronemann*, 601 F.3d at 604 (providing that evidence of pretext is generally,

but not always, sufficient to survive summary judgment).[19]  Ordinarily, "positive evidence

beyond mere [temporal] proximity is required to defeat the presumption that the proffered

explanations are genuine."  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).  In this case,

even assuming, *arguendo*, that the challenged employment actions were sufficiently adverse,

Herbert has failed to adduce sufficient evidence to permit a reasonable fact finder to conclude

that the AOC's proffered reasons for two of the three challenged employment actions were

---

[19]  Despite his stated position to the contrary, Herbert simply has not presented any "direct evidence" that the letter of reprimand, the timing of his promotion, or the investigation were discriminatory or retaliatory.  *See generally Manuel v. Potter*, 685 F. Supp. 2d 46, 60 n.11 (D.D.C. 2010) ("direct evidence" is that which, if believed by the fact finder, establishes the fact in question without any need for an inference, including statements or documents showing a discriminatory or retaliatory animus on their face).

pretextual—namely, the letter of reprimand and the timing of Herbert's promotion. At the same time, at least three reasons preclude the Court from reaching the same conclusion as to the investigation: there is a genuine dispute as to whether Herbert was the unidentified "troublemaker" driving the investigation; Herbert's name arose with some frequency during the course of the investigation; and the investigation followed closely on the heels of Herbert's internal complaints.

### 1. No Reasonable Fact Finder Could Conclude that the AOC's Proffered Reasons for Issuing the Letter of Reprimand Were Pretextual

In opposing summary judgment, a plaintiff must do more than "assert that in his view, [the employer's] actions against him were imprudent or unfair; an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as . . . [discriminatory or retaliatory motivations] do not influence the decision." *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125 (D.D.C. 2005) (internal quotation marks omitted). Where, as here, "the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495. In other words, even though the reason may turn out in retrospect to be mistaken or false, the question is "whether the employer honestly and reasonably believed that the underlying . . . incident occurred." *Id.* at 496.

Understandably, Herbert does not agree with all the particulars of the factual allegations supporting the AOC's reprimand, but the essential facts are not genuinely disputed. Upon discovering the state of the furniture in the suite, Herbert became upset and "got fussing" and "got cussing." Herbert Dep. at 38. For example, he told Brown, the crew leader, that "[he] didn't come . . . to F'ing move this furniture." Herbert Dep. at 40. By his own admission, he

"told [] Brown that [he] was not going to move furniture."  Def.'s Stmt. Ex. 8 at 173.  Regardless

of whether Herbert did or did not "specifically" refuse to move furniture a second time, it is

undisputed that Herbert initially resisted the instruction and strenuously voiced his objections.

Under these circumstances, no reasonable fact finder could conclude that the AOC's decision to

reprimand Herbert "for failure to perform assigned duties, and [the use of] inappropriate

language in the workplace" was a mere pretext for intentional discrimination or retaliation.

Def.'s Stmt. Ex. 18 at 193.  *See Reshard*, 2010 WL 1379806, at *17 (employee, having admitted

some of the underlying conduct, could not establish that challenged letter of reprimand was

pretextual); *Walker v. Johnson*, 501 F. Supp. 2d 156, 174-75 (D.D.C. 2007) (despite employee's

disagreement, reasons for letter of reprimand were clear from the letter itself and supported by

the facts).  Simply questioning an employer's judgment in issuing a letter of reprimand is

insufficient to establish pretext.  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 95 (D.D.C. 2005),

*aff'd*, 222 Fed. Appx. 5 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1243 (2008).

　　　Herbert's counter-arguments do not warrant a different result.  Even crediting his

contention that others in the crew initially complained about having to move furniture, Herbert

has not shown that the members of the crew were "similarly situated" to him, either in terms of

their immediate response to the prospect of having to move furniture or in their broader

employment situations.  *See Adair v. Solis*, __ F. Supp. 2d __, 2010 WL 3833920, at *10 n.12

(D.D.C. Sept. 30, 2010) (plaintiff must show that the relevant aspects of comparators'

employment situations are "nearly identical.").  As an initial matter, Herbert and Brown were the

only permanent painters on the crew that evening, Herbert Dep. at 30-31, a potentially critical

distinction because the applicable disciplinary policy is limited, by its terms, to permanent

employees, Pl.'s Stmt. Ex. 36 at 752-3.  More to the point, it is undisputed that Herbert was the only member of the crew who left the suite to complain, and there is no evidence in the record suggesting that anyone apart from Herbert told Brown that they would not move furniture.  *See supra* Part II.B.1.

In a similar vein, Herbert has not shown that he and his only remaining proffered comparator, Charlie DiPasquale ("DiPasquale"), were "similarly situated" in all relevant respects.[20]  *Adair*, 2010 WL 3833920, at *10 n.12.  DiPasquale, also a W-9 Painter in the Paint Shop, is a white male who has not engaged in protected activity.  Bryan Dep. at 55; Williams Dep. at 116.  On or about October 30, 2007, roughly eleven months removed from the events at issue in this case, DiPasquale was involved in an "incident" at the workplace, his second.  Def.'s Stmt. ¶¶ 37-39; Pl.'s Stmt. ¶¶ 37-39.  In connection with these events, Williams prepared an "incident report," which states that DiPasquale engaged in "inappropriate behavior on the job site"—namely, becoming "angry over his work assignment . . . [and] yelling [and] cursing [and] throwing his tools around."  Def.'s Stmt. Ex. 24 at 159.  However, DiPasquale complied with the instruction and completed the assignment.  Pl.'s Stmt. Ex. 29 at 73.  DiPasquale, for his part, admitted that he "did blow off some steam," but stated that he complied because he did "not wish to get fired due to insubordination."  Pl.'s Stmt. Ex. 30.  The following day, Wood, the Assistant Superintendent, wrote others suggesting that a written letter of reprimand be issued.  Pl.'s Stmt. ¶ 40 & Ex. 32 at 160.  It is undisputed, however, that DiPasquale never received a letter of

---

[20]  In passing, Herbert identifies an additional Paint Shop employee, an African American who apparently never engaged in protective activity, who was at one point verbally reprimanded. Williams Dep. at 106-07.  Herbert has also failed to establish that he and this employee were similarly situated, most notably in that he never specifically identifies the nature of the employee's alleged transgression nor establishes that they occupied comparable positions.

reprimand.  For reasons not entirely clear from the record,[21] management ultimately decided to require counseling and use of the Employee Assistance Program.  Def.'s Stmt. ¶ 42 & Ex. 25 at 67, 159; Pl.'s Stmt. ¶ 42.  While there is some overlap between DiPasquale's conduct and Herbert's, the two are not "nearly identical," such that might support an inference of pretext.  *Adair*, 2010 WL 3833920, at *10 n.12.  First, the overwhelming evidence indicates that DiPasquale complied with his supervisors' instructions and completed his assignment in a way Herbert did not.  Pl.'s Stmt. Ex. 29 at 73; Bryan Dep. at 57-58; Williams Dep. at 107; Thomas Decl. ¶ 4.  Second, Herbert refused to follow instructions in the context of a congressional move, generally considered to be the busiest time for the Paint Shop.  *See supra* Part II.B.  Third, Herbert assumes, but never actually attempts to demonstrate, that the type of "incident report" issued in connection with DiPasquale's conduct has a materially lesser "adverse" impact on an individual's employment at the AOC.  For each of these reasons, whether considered together or independently, Herbert has failed to demonstrate that DiPasquale was "similarly situated," "charged with a comparable offense[,] and then treated less harshly."  *Adair*, 2010 WL 3833920, at *10 n.12.

Finally, Herbert has failed to establish that there is a genuine dispute as to whether the AOC departed from its progressive disciplinary policy in this case by issuing him an official reprimand in lieu of an informal warning.  True, the applicable written policy provides that

---

[21]  While the AOC maintains that it recommended informal discipline for DiPasquale due to mitigating circumstances (medical and health concerns), Thomas Decl. ¶¶ 5-6, the record is insufficiently clear whether this actually motivated the relevant decisionmakers.  Neither Williams nor Woods recalls why formal discipline was not imposed.  Def.'s Stmt. ¶ 41; Pl.'s Stmt. ¶ 41.

"[d]isciplinary actions are normally imposed in a progressively stringent pattern."[22]  Pl.'s Stmt.

Ex. 36 at 752-3.  However, where the employee "fail[s] to obey the reasonable orders of a

supervisor/management official" or "fail[s] to perform assigned duties in a satisfactory manner,"

the normal sequence is as follows: reprimand; suspension; and removal.  *Id.* at T-1.  Consistent

with this language, Cave testified at her deposition that the "typical penalties for . . . some of the

charges . . . would jump straight to a first offense formal discipline action," and expressly

identified as an example "employees who don't follow orders."  Cave Dep. at 19-20.  Under

these circumstances, a jury could not infer that the AOC issued the letter of reprimand with a

discriminatory or retaliatory intent merely because the AOC did not first resort to more informal

forms of disciplinary action.

### 2. No Reasonable Fact Finder Could Conclude that the AOC's Proffered Reason for the Timing of Herbert's Promotion Is Pretextual

Similarly, no reasonable fact finder could conclude that the AOC's proffered reason for

the timing of Herbert's promotion to the position of W-9 Painter was not the actual reason and

was instead pretextual.  As an initial matter, Herbert has adduced no evidence that would allow a

reasonable fact finder to conclude that anyone actually intended to promote Herbert at any time

prior to his actual promotion.  *See supra* Part IV.A.2.  In any event, the parties' settlement

agreement unambiguously delineated the time frame for processing Herbert's promotion, and it is

undisputed that the AOC in fact complied with that time frame.  *See supra* Part II.A.  In light of

the "emphatic nature" of the parties' prior settlement agreement, "no reasonable jury could infer

---

[22]  "An exception to the listed sequence may be recommended by the first-line supervisor if the problem(s) is serious and should not be handled through progressive actions."  Pl.'s Stmt. Ex. 36 at 752-3.  The policy provides a non-exhaustive list of "serious problems," all of which involve misconduct of an order of magnitude greater than Herbert's conduct.  *Id.*

discriminatory or retaliatory intent from [the AOC's] reliance" on its terms and conditions.

*Kersey v. Washington Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009).

## V.  CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit.  Accordingly, and for the reasons stated above, the Court shall GRANT the AOC's [25] Motion for Summary Judgment and DISMISS this action in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


Date:   February 23, 2011

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge
